IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**KEVIN LEE BOYINGTON,**
  **Plaintiff,**

vs.            Case No. 3:04cv352/RS/MD

**KEVIN COXWELL,**
**JAMES H. NEWTON, IV,**
  **Defendants.**

---

ORDER and
REPORT AND RECOMMENDATION

  This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon defendants' special report and supporting documents filed on August 1, 2005. (Doc. 25).  The *pro se* plaintiff, a state prisoner who is proceeding *in forma pauperis* in this action,[1] responded to the special report. (Doc. 31).  On September 20, 2005 the court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informing the parties that the special report would be construed as a motion for summary judgment as of October 20, 2005. (Doc. 32).  Neither party has filed additional argument or Rule 56 materials.  Upon review of the parties' submissions, it is the opinion of the undersigned that the motion for summary judgment filed by defendants should be granted in part and denied in part.

BACKGROUND

  The following material facts are without substantial controversy.  On October 21, 2002 at approximately 9:00 p.m. Escambia County deputy sheriffs, including

---

[1] Court records reflect that plaintiff has made sufficient partial filing fee payments to satisfy the filing fee.

defendants Newton and Coxwell, went to a residence in Escambia County, Florida, to serve arrest warrants on two individuals -- Ted Ward and plaintiff. Prior to that evening Deputy Newton had been advised that there were outstanding warrants for the arrest of these individuals, and that plaintiff could be violent. Also prior to that evening, Deputy Coxwell had received information that plaintiff might have a tendency to run. Accordingly, Deputy Newton arranged to have additional Escambia County deputy sheriffs present, including Sergeant Barton, Deputy Sheriffs Jack Ward, Kevin Coxwell with his K-9 Atos, Mark Aldridge and Ozell Powell.

When the deputies arrived at the scene, one of the suspects, Mr. Ward, came outside and was arrested without incident. Deputy Aldridge went inside to locate plaintiff. Plaintiff had exited the residence and hidden outside, crouching beside an air conditioning unit which was located by a wall of the residence. Upon Deputy Newton learning that plaintiff had "taken off," the deputy sheriffs set up a perimeter around the residence. Deputy Newton went to the north side of the house and walked to the back. He walked past the air conditioning unit, but initially did not see plaintiff. After hearing some noise, he walked back and saw plaintiff crouched next to the air conditioning unit.

The parties' versions of events significantly diverge as to the circumstances surrounding plaintiff's capture. Plaintiff states that upon Deputy Newton discovering him, the deputy gave a loud verbal order for plaintiff to move away from the residence and air conditioning unit. (Doc. 22, p. 7b ¶ 19). Very shortly thereafter, plaintiff was surrounded by four other deputies. (Doc. 31, Boyington Aff. ¶ 13). Never rising to his feet, plaintiff crawled away from the unit and locked his fingers behind his head while on his knees. (Doc. 22, p. 7b ¶ 20; doc. 31, Boyington Aff. ¶ 13). Plaintiff complied with all orders given him by Deputy Newton and never rose to his feet. The five deputies encircled plaintiff, standing within 3-4 feet of him. (Doc. 31, Boyington Aff. ¶¶ 14-15). While plaintiff was complying with Deputy Newton's orders, Deputy Coxwell came around the corner of the residence and, without provocation, released the police dog, giving it an order to attack. (*Id.*, ¶ 22). The dog came up from behind plaintiff and, while plaintiff was still on his knees with

his hands behind his head and fingers interlocked, went underneath plaintiff's raised right elbow and bit plaintiff on top of his right thigh. The bite caused several deep lacerations. (*Id.*, ¶ 23; *see also* doc. 31, Boyington Aff. ¶ 16). Deputy Coxwell called the dog off, and Deputy Newton knocked plaintiff forward onto his face and stomach, knelt down on plaintiff's back and handcuffed him. (*Id.*, ¶ 25; doc. 31, Boyington Aff. ¶ 17). As plaintiff was being handcuffed, he pleaded with Deputy Coxwell to not allow the dog to attack again. (*Id.*, ¶ 25). While plaintiff was lying face down on the ground with his hands cuffed behind his back, and with Deputy Newton still kneeling on him, Deputy Coxwell again released the K-9, commanding it to attack. (*Id.*, ¶ 26; *see also* doc. 31, Boyington Aff. ¶ 17). The dog attacked plaintiff again, causing several deep lacerations to plaintiff's calf and to an area on the back of his knee. (Doc. 31, Boyington Aff. ¶ 17). All of the deputies stood by and watched the dog attack plaintiff, despite the fact that at no time did plaintiff attempt to flee or pose a risk of harm. All of the deputies present were in a position to intervene, but failed to do so. (Doc. 22, ¶¶ 28-29). Prior to plaintiff being taken to the hospital, Deputies Newton and Coxwell approached plaintiff and told him that "this is what happens to people who do drugs and date officers' girlfriends."[2] Plaintiff was also told that "we deputies take care of our own in this County" and that plaintiff "deserved what [he] got from the dog." (*Id.*, ¶ 30). Plaintiff was taken to Sacred Heart Hospital in Pensacola, Florida, where he received fifteen stitches "after the muscle tissue had been pushed back into the leg." (*Id.*, ¶ 32). As a result of Deputies Coxwell's and Newton's actions, plaintiff suffered severe pain; numerous deep lacerations; scarring; muscle, tissue, and nerve damage; and psychological trauma. (*Id.*, ¶ 33, *see also* p. 8b ¶ (f)).

The defendants recount plaintiff's capture quite differently. In his supporting affidavit, Deputy Newton states that when he discovered plaintiff crouched next to the air conditioning unit, plaintiff had something silver in his hand and refused to show Newton his hands. (Doc. 25, Newton Aff. ¶ 7). Deputy Newton told plaintiff he

---

[2]According to plaintiff, he was dating a woman who was the girlfriend of then-deputy sheriff Michael Ely. Deputies Newton and Coxwell "were friends of, and worked on the same shift as, Deputy Ely." (Doc. 22, pp. 7-7(a)).

was under arrest and repeatedly instructed plaintiff to lie down on the ground and to drop what was in his hands.  Plaintiff refused to comply with these repeated commands, refused to show his hands, and began to stand up as it he were going to flee.  (*Id.*).  Plaintiff's refusal to show his hands, and the silver object Deputy Newton observed, led the Deputy to believe plaintiff was armed.  (*Id.*, ¶ 8).  Deputy Coxwell arrived at Newton's location with his K-9.  Deputies Coxwell and Newton gave plaintiff commands to show his hands; however, plaintiff still refused to do so.  Deputy Coxwell gave his K-9 an order to apprehend plaintiff.  At that point, plaintiff fell to the ground where he struggled with the K-9.  Deputy Coxwell was unable to handcuff plaintiff because he refused to put his hands behind his back.  (*Id.*, ¶ 9).  Deputy Sheriff Stephen Aldridge assisted Deputy Newton in handcuffing plaintiff.  (*Id.*, ¶ 10).  Once plaintiff was handcuffed, a silver cell phone was identified as the object in his hands.  (*Id.*, ¶).

Deputy Coxwell states in his supporting affidavit that when he arrived at Deputy Newton's location, plaintiff was standing up. (Doc. 25, Coxwell Aff. ¶ 6).  He could see something in plaintiff's hand, and it appeared to the Deputy that plaintiff might be getting ready to run because plaintiff had turned his back toward Deputies Newton and Coxwell.  (*Id.*).  Deputy Newton gave plaintiff repeated commands to show his hands, but plaintiff did not cooperate or show his hands.  Accordingly, Deputy Coxwell gave his K-9 a command to apprehend plaintiff.  Plaintiff was apprehended on his right thigh and went to the ground where he struggled with the K-9.  (*Id.*, ¶ 7).  Deputy Coxwell was unable to handcuff plaintiff.  Eventually, Deputy Aldridge assisted Deputy Newton in handcuffing him.  The K-9 was not instructed more than once to apprehend plaintiff.  When plaintiff was handcuffed, Deputy Coxwell gave the K-9 a command to release.  (*Id.*, ¶ 8).  At the time Deputy Coxwell assisted in the apprehension of plaintiff, he had no information that plaintiff had dated a girlfriend of an Escambia County deputy sheriff.  (*Id.*, ¶ 9).

In support of their summary judgment motion, defendants have also submitted the affidavit of Escambia County Deputy Sheriff Mark Stephen Aldridge.  (Doc. 25, Aldridge Aff.).  Deputy Aldridge states that he assisted with the service of the arrest

warrants on the evening in question. He had gone inside the residence, but after hearing yelling outside he went outside to the end of the house. (*Id.*, ¶ 5). Deputy Aldridge heard orders being given to plaintiff to put his hands behind his back. Both Deputy Newton and Deputy Coxwell (with his K-9) were present and giving orders to plaintiff. Plaintiff was on the ground being held by the K-9. (*Id.*). Plaintiff would not comply with commands to put his hands behind his back. Accordingly, Deputy Aldridge took one of plaintiff's arms and placed it behind his back. Deputy Newton took the other arm and placed it behind plaintiff's back. Together the two were able to handcuff plaintiff, and the K-9 was released. (*Id.*, ¶ 6).

In response to the summary judgment motion, plaintiff has submitted a verified response and an affidavit in which he recounts the facts as set forth in his complaint. In addition, he denies defendants' allegations concerning the cell phone:

> Newton claims Boyington had something "silver" in his hand when in fact the property voucher reveals it was a "gold" cell phone.
>
> Deputy Newton claims he told Boyington to lie down and drop what was in his hand. . . . This statement is incorrect. Newton instructed Boyington to place his hands on his head and come out into the open. Boyington placed his gold cell phone on top of the air conditioner, placed his hands behind his head interlocking his fingers, and walked on his knees into the open complying with Newton's instructions.

(Doc. 31, p. 4).

## PROCEDURAL HISTORY

Plaintiff filed his second amended complaint against Escambia County deputy sheriffs Coxwell and Newton, alleging civil rights violations under 42 U.S.C. § 1983 (use of excessive force in violation of plaintiff's rights under the Fourth and Fourteenth Amendments).[3] Specifically, plaintiff seeks to hold Deputy Coxwell liable

---

[3] Plaintiff's initial complaint named as defendants Deputy Coxwell, Deputy Newton, Sheriff Ron McNesby and the Escambia County Sheriff's Department ("ECSD"). (Doc. 1). Plaintiff sought to hold defendants McNesby and ECSD liable because they were the supervisor and employer of Deputies Coxwell and Newton. (Doc. 1, p. 7). In an amendatory order, the court advised plaintiff that *respondeat superior*, without more, does not provide a basis for recovery under 42 U.S.C. § 1983. (Doc. 7). The court then advised plaintiff what was necessary to impose liability on a municipality and

for using excessive force in commanding the K-9 to attack him.  Plaintiff seeks to hold Deputy Newton liable for failing to prevent or intervene in Deputy Coxwell's use of excessive force.  Plaintiff states he is suing defendants in their "personal and professional capacities."  (Doc. 22, p. 8d).  As relief, he seeks injunctive relief against the Escambia County Sheriff's Department and monetary damages against defendants Newton and Coxwell individually in a total amount of $1.5 million.  (*Id.*, pp. 8, 8c-8d).

Defendants, in their motion for summary judgment, assert that no cause of action exists against Deputies Newton and Coxwell in an official capacity. Defendants further maintain that they are entitled to summary judgment on plaintiff's individual capacity claims of excessive force and failure to intervene, because plaintiff's amended complaint fails to establish a constitutional violation.  Finally, they contend they are entitled to qualified immunity (further arguing that plaintiff cannot meet the burden of demonstrating that they violated clearly established law).

## DISCUSSION

**Federal Rights Potentially Vindicated by Plaintiff's Excessive Force Claim**

Because § 1983 is only an enabling statute, the court must discern what underlying federal right is purportedly being vindicated by this action.  In his second amended complaint, plaintiff claims that the defendants engaged in excessive force in violation of his rights under the Fourth and Fourteenth Amendments.  (Doc. 22, p. 8).  It is clear that under either parties' rendition of the facts of this case, the proper standard of review is under the Fourth Amendment.

In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court readily concluded that the Fourth Amendment applies to claims that a police officer utilized excessive force in effecting the initial arrest of a suspect, because the arrest of a person constitutes a "seizure" for the purpose of the Fourth Amendment and the deliberate use of excessive force in effecting that arrest

---

on a supervisor.  (*Id.*, pp. 3-4).  Thereafter, plaintiff filed his first amended complaint in which he deleted Sheriff McNesby and ECSD as defendants.  (Doc. 8).

amounts to an "unreasonable seizure" that is specifically prohibited by the Fourth Amendment. *Graham*, 490 U.S. at 394, 109 S.Ct. at 1871. As the Court explained:

> Where, as here, the excessive force claim arises in the context of an arrest or an investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable seizures" of the person. . . . *[A]ll* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id.*, 490 U.S. at 394-95, 109 S.Ct. at 1871 (emphasis in original). In contrast, the *Graham* Court noted that the Due Process Clause of the Fourteenth Amendment protects a pretrial detainee against the use of excessive force.

It is undisputed that defendant Coxwell's use of the K-9 occurred in the course of plaintiff's arrest. Thus, plaintiff's claims are properly brought under the Fourth Amendment. *See, e.g., Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality rejecting a substantive due process claim under the Fourteenth Amendment because the Fourth Amendment addressed "the matter of pretrial deprivations of liberty."); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." (citation omitted); *United States v. Myers*, 972 F.2d 1566, 1571 (11th Cir. 1992) (upholding a Fourth Amendment jury instruction in a post-arrest, pre-charge excessive force case); *Moreland v. Dorsey,* 230 F.Supp.2d 1338 1345 (N.D. Ga. 2002). Therefore, to the extent plaintiff brings a claim under the Due Process Clause of the Fourteenth Amendment, such claim should be dismissed. Plaintiff's only viable claim lies under the Fourth Amendment.

**Summary Judgment Standard**

In order to prevail on their motion for summary judgment, the defendants must show that plaintiff has no evidence to support his case or present affirmative evidence that plaintiff will be unable to prove his case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If the defendants successfully negate an essential element of plaintiff's case, the burden shifts to plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id. Accord Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). Further, plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp.*, 477 U. S. at 324 (quoting FED.R.CIV.P. 56(e)). Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Celotex Corp., supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleading and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"), *cert. denied*, 522 U.S. 1126 (1998) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e))); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to plaintiff. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282

(11th Cir. 1999). A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S. Ct. at 2552.

Fourth Amendment Standard

"The Fourth Amendment encompasses the right to be free from the use of excessive force during an arrest." *Crosby v. Monroe County*, 394 F.3d 1328, 1333 (11th Cir. 2004). When a plaintiff alleges excessive force by an officer in the course of executing an arrest, he must show that the officer's conduct was objectively "unreasonable." *Graham*, 490 U.S. at 395-97, 109 S.Ct. 1865. Such a test looks not to the motivation of the particular officer, but instead examines whether a reasonable officer would have taken the same action given the facts and circumstances confronting him. *Id.*, at 397, 109 S.Ct. 1865; *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002) ("The question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer.").

The Supreme Court has recognized that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Consequently, in applying the "objective reasonableness" standard, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make spit-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.*, at 396-97.

In light of all of these considerations, the assessment of a police officer's use of force is a highly factual inquiry. When determining whether an officer's use of

force was objectively reasonable, a court should consider "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically.'"  *Moore v. Gwinnett County*, 967 F.2d 1495, 1498 (11th Cir. 1991) (quoting *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)).  In short, the Fourth Amendment prohibits force that is objectively unreasonable, both in the decision to implement the force and in the degree of force.  *Graham v. Connor*, 490 U.S. at 394; *Cottrell v. Caldwell*, 85 F.3d 1480, 1492 (11th Cir. 1996).

### Failure to Intervene

An officer can be liable for failing to intervene when another officer uses excessive force.  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000); *see also Ensley v. Soper*, 142 F.3d 1402, 1407-08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]").  This liability, however, only arises when the officer observes the violation, is in a position to intervene, and fails to do so.  *Priester*, 208 F.3d at 924.

### Qualified Immunity

Defendants assert that they are entitled to qualified immunity from suit in their individual capacities.  The doctrine of qualified immunity is a guarantee of fair warning.  *McElligott v. Foley,* 182 F.3d 1248, 1260 (11th Cir. 1999).  It shields government officials from individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct.  *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Powell v. Ga. Dep't of Human Resources*, 114 F.3d 1074 (11th Cir. 1998).  Qualified immunity seeks to ensure that individuals can reasonably anticipate

when their conduct may give rise to liability, and hence, liability only attaches if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right. *McElligott*, 182 F.3d at 1260 (citing *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

In order to receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d at 1194 (internal quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.,* at 1194.  The Supreme Court has established a two-part test for evaluating a claim of qualified immunity.  First, the trial court must determine whether a constitutional right has been violated on the facts alleged. *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).  The court must assess the facts in a light most favorable to the party asserting the injury.  *Id*.  Second, if a violation has been established, the court must determine whether the right was "clearly established."  *Id*.  The very action in question need not have been held unlawful for an official to lose the protection of qualified immunity.  *Hope v. Pelzer*, 122 S.Ct. at 2515; *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).  Officials can still be on notice that their conduct violates established law even in novel factual circumstances, and there is no requirement that previous cases be "fundamentally" or even "materially" similar.  *Hope v. Pelzer*, 122 S.Ct. at 2516.  Instead, the law merely must give defendants "fair warning" that their actions are unconstitutional.  *Id*.  In light of pre-existing law, the unlawfulness must be apparent.  *Id*.; *Creighton*, 483 U.S. at 640, 107 S.Ct. 3034.

"In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998) (quoting *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n. 4. (11th Cir. 1997)).

**Conclusions of Law Regarding Material Facts**

Defendants maintain that no cause of action exists against them in an official capacity because no record evidence exists, nor has plaintiff alleged, that they had the authority to make final policy for the Escambia County Sheriff's Department. Moreover, no record evidence exists that any discretionary decisions made by defendants were not constrained by official policies and were not subject to review. (Doc. 25, pp. 4-5). The undersigned agrees.

Plaintiff's cause of action against the deputies in an official capacity is the same as a suit against Escambia County. *Hobbs v. Roberts*, 999 F.2d 1526, 1530 (11th Cir. 1993) ("[O]fficial capacity suits represent 'only another way of pleading an action against an entity of which an officer is an agent,' and a victory against a named individual in an official capacity suit is 'a victory against the entity that employs him.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167-68, 105 S.Ct. 3099, 3105-06, 87 L.Ed.2d 114 (1985))); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991) ("[Official capacity] suits against municipal officers are . . ., in actuality, suits directly against the [municipality] that the officer represents."). The law is clear that a municipality can be held liable under § 1983 "only when the execution of the government's policy or custom . . . inflicts the injury. . . ." *City of Canton, Ohio v. Harris*, 478 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 419 (1989) (internal quotation marks omitted); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993); *McDowell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 2004). Thus, a plaintiff seeking to impose liability on a municipality under § 1983 must identify a particular municipal "policy" or "custom" that caused the constitutional injury. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "'A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. . . . A custom is a practice that is so settled and permanent that it takes on the force of law.'" *Cooper*

*v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).

In the instant case, plaintiff neither claims nor alleges facts to suggest that Deputy Newton or Deputy Coxwell possessed the final policymaking authority required to support an official capacity claim. *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990) ("[T]o subject the Sheriff's Department to liability for [a deputy sheriff's] deeds, [the deputy sheriff] must have possessed the authority to make final policy.") (citing *City of St. Louis v. Praprotnik*, 458 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion)). "[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Mandel v. Doe*, 888 F.2d 783, 792 (11th Cir. 1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. at 125-28, 108 S.Ct. at 924-26). Thus, to the extent plaintiff attempts to state a cause of action against defendants Newton and Coxwell in an official capacity, the defendants are entitled to summary judgment in their favor as a matter of law.

Defendants also maintain that, as to plaintiff's individual capacity claims, they are entitled to summary judgment on qualified immunity grounds. They argue:

> **Deputy Newton repeatedly instructed Mr. Boyington to show his hands, to lie down on the ground and to drop what he had in his hands. Deputy Newton also advised Mr. Boyington that he was under arrest. Mr. Boyington refused to comply with Deputy Newton's repeated commands, refused to show his hands, and began to stand up as if he were going to run. Due to the silver object he observed in Mr. Boyington's hands, Deputy Newton reasonably believed that Mr. Boyington was armed.**
>
> **. . . Deputy Coxwell also observed something in Mr. Boyington's hand and it appeared to Deputy Coxwell that Boyington was getting ready to flee. . . . Due to Mr. Boyington's refusal to cooperate with any of Deputy Newton's repeated commands, Deputy Coxwell gave his K-9 Atos a command to apprehend Mr. Boyington.**

(Doc. 25, p. 9). Thus, defendants maintain that plaintiff has failed to establish that they committed a constitutional violation. They further contend that "[n]o pre-

existing law made it apparent to either Defendant Newton or Defendant Coxwell, under the totality of the circumstances they faced, that apprehending Plaintiff by use of a K-9 violated his clearly established rights.  To the contrary, the apprehension of Mr. Boyington by the K-9 was objectively reasonable under the circumstances." (*Id.*, pp. 9-10).

The parties do not dispute that the defendants performed the alleged wrongful acts while acting within the discretionary authority of their employment.  The problem with defendants' argument is that the "circumstances" to which they refer are based on *their* version of events.  In analyzing whether defendants are entitled to qualified immunity, the court must take the "facts" in the light most favorable to the *plaintiff* and determine the legal issue of whether the plaintiff's "facts," if proven, show that the defendants violated clearly established law.  *Priester*, 208 F.3d at 925 n. 3 (citing *Kelly v. Curtis,* 21 F.3d 1544, 1546 (11th Cir. 1994)).  The court has already set forth the facts which, based on the summary judgment record, are not in dispute. These facts establish the events leading up to Deputy Newton's discovery of plaintiff near the air conditioner. The parties sharply dispute the circumstances surrounding plaintiff's capture.  These disputed facts are critical to plaintiff's excessive force claim.[4]

Taking the summary judgment evidence in the light most favorable to plaintiff, plaintiff has stated a constitutional violation.  Plaintiff was the subject of a felony arrest warrant and had been described to defendants as one who "could be violent" and "might have a tendency to run."  When deputies arrived at the residence to execute the warrant, plaintiff fled out a back door and hid outside near an air conditioning unit. After Deputy Newton discovered plaintiff and ordered him to place his hands on his head and come out into the open, plaintiff placed his gold cell

---

[4]To list just a few examples, genuine issues of material fact exist as to what Deputy Newton's commands were and whether plaintiff followed them; whether plaintiff had a silver cell phone in his hands and refused to drop it; how many deputy sheriffs were present during plaintiff's capture; whether, upon Deputy Coxwell's arrival at plaintiff's location, plaintiff was standing or stood up as if preparing to flee; whether, after Deputy Coxwell initially commanded the K-9 to apprehend plaintiff and then commanded the K-9 to release, Deputy Coxwell again commanded the K-9 to apprehend plaintiff while plaintiff was lying face down with his hands cuffed behind his back; *etc*.

phone on top of the air conditioner, placed his hands behind his head interlocking his fingers, and walked on his knees into the open. Plaintiff never rose to his feet. Deputy Newton and four other deputies encircled plaintiff, standing within 3-4 feet of him. While plaintiff was complying with Deputy Newton's orders, Deputy Coxwell came around the corner of the residence and, without provocation, released the K-9 and commanded it to attack. The dog came up from behind plaintiff and, while plaintiff was still on his knees with his hands behind his head and fingers interlocked, bit plaintiff on top of his right thigh. Deputy Coxwell called the dog off, and Deputy Newton knocked plaintiff forward onto his face and stomach, knelt down on plaintiff's back and handcuffed him. With plaintiff still lying face down on the ground with his hands cuffed behind his back and Deputy Newton kneeling on him, Deputy Coxwell again released the K-9 and commanded it to attack. The dog attacked plaintiff again, causing several deep lacerations to plaintiff's calf and an area on the back of his knee. All of the deputies, including Deputy Newton watched as the dog attacked plaintiff. Prior to plaintiff being taken to the hospital, Deputies Newton and Coxwell approached plaintiff and told him that "this is what happens to people who do drugs and date officers' girlfriends." Plaintiff was also told that "we deputies take care of our own in this County" and that plaintiff "deserved what [he] got from the dog." As a result of the attack, plaintiff sustained numerous deep lacerations, muscle, tissue and nerve damage, and scarring. He also suffered severe pain and psychological trauma. Given these facts, a reasonable jury could conclude that defendant Coxwell's use of the K-9 in the manner described constituted unreasonable and excessive force in violation of plaintiff's constitutional rights under the Fourth Amendment.

As to defendant Newton's alleged failure to intervene in Coxwell's use of the K-9, according to plaintiff defendant Newton "was in a position to stop this vicious attack and failed to do so." (Doc. 31, p. 5; Doc. 22, pp. 7b-7c ¶ 29). Defendant Newton, as well as the other deputy sheriffs "stood by and watched the dog attack [plaintiff]." (Doc. 22, p. 7b ¶ 28). Defendant Newton does not specifically deny these allegations. However, the facts set forth in his summary judgment materials

describe his attention as focused on plaintiff during one or both of the occasions the K-9 was released. Therefore a finder of fact could find that Newton may not have known that Deputy Coxwell was preparing to release the dog. Summary judgment is inappropriate where genuine disputes of material fact exist as to whether defendant Newton had a reasonable opportunity to intervene and protect plaintiff, and failed to do so.

"The next, sequential step [in the qualified immunity analysis] is to ask whether the right was clearly established." *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. at 2156. The applicable law being "clearly established" is what ensures that the official has notice or "fair warning" that his conduct is unlawful. *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir.), *cert. denied*, 540 U.S. 816, 124 S.Ct. 76, 157 L.Ed.2d 32 (2003) (citing *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. at 2158).

The Supreme Court and the Eleventh Circuit have explained that such fair and clear notice can be given in various ways. First, the words of the pertinent federal constitutional provision "may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." *Vinyard v. Wilson*, 311 F.3d at 1350. In excessive force cases in the Fourth Amendment context, the Eleventh Circuit has recognized that "an official's conduct could run so afoul of constitutional protections that fair warning was present even when particularized caselaw was absent." *Willingham*, 321 F.3d at 1303; *Priester*, 208 F.3d at 926 ("the official's conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.") (internal quotation marks omitted and alteration in original). And the Eleventh Circuit, in the absence of particularized caselaw, has acted to deny qualified immunity to officials whose use of force clearly exceeded the "hazy border" surrounding acceptable force. *Priester*, 208 F.3d at 927 (concluding law was clearly established and force was "clearly-excessive-even-in-absence-of-case-law" when officer released police dog to attack plaintiff who was lying on the ground, did not pose a threat to officers or to anyone else, and was not attempting to flee or resist arrest); *see also, e.g., Lee v. Ferraro*, 284 F.3d at 1199 (denying

qualified immunity--without particularized precedent--in excessive force case where officer slammed arrestee's head on car trunk after "she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed"); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (denying qualified immunity--without particularized precedent--to officers who slammed arrestee's head into pavement, "even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way); *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (concluding officer's conduct was "far beyond the hazy border" and unlawfulness was "readily apparent even without clarifying caselaw" when officer, while on plaintiff's back and handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures even though plaintiff at the time was offering no resistance at all).

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, the court then turns to case law. In some instances, general decisional rules (broad statements of principle in case law that are not tied to particularized facts) can clearly establish law applicable in the future to different sets of detailed facts. "These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions." *Vinyard v. Wilson*, 311 F.3d at 1351.

Third, if the court has no case law with a broad holding that is not tied to particularized facts, the court then looks at precedent that *is* tied to the facts. The fact-specific precedent can clearly establish the applicable law "if the circumstances facing [the] government official are not fairly distinguishable" from that precedent. *Id.*

The undersigned is persuaded that the law was clearly established in October of 2002 (the date this incident occurred) that what defendants Newton and Coxwell did (according to plaintiff's version of events) violated plaintiff's constitutional rights. According to plaintiff's version as previously recounted, even conceding that plaintiff was the subject of a felony arrest warrant and had been described to

defendants as one who "could be violent" and "might have a tendency to run," and who had initially eluded officers by fleeing out a back door and hiding by an air conditioning unit, the facts remain (at least according to plaintiff) that after Deputy Newton discovered plaintiff and ordered him to place his hands on his head and come out into the open, plaintiff placed a gold cell phone he was holding on top of the air conditioner, placed his hands behind his head interlocking his fingers, and walked on his knees into the open.  Plaintiff never rose to his feet.  While plaintiff was complying with Deputy Newton's orders and was encircled by a total of five deputies standing within 3-4 feet of him, Deputy Coxwell came around the corner of the residence and, without provocation, released his K-9, commanding it to attack.  According to plaintiff, the K-9 came up from behind plaintiff and, while plaintiff was still on his knees with his hands behind his head and fingers interlocked, bit plaintiff on top of his right thigh.  Deputy Coxwell called the dog off, and Deputy Newton knocked plaintiff forward onto his face and stomach, knelt down on plaintiff's back and handcuffed him.  With plaintiff still lying face down on the ground with his hands cuffed behind his back and Deputy Newton kneeling on him, Deputy Coxwell again released the dog and commanded it to attack.  The dog attacked plaintiff again, causing several deep lacerations to plaintiff's leg.  Prior to plaintiff being taken to the hospital, Deputies Newton and Coxwell approached plaintiff and told him that "this is what happens to people who do drugs and date officers' girlfriends." Plaintiff was also told that "we deputies take care of our own in this County" and that plaintiff "deserved what [he] got from the dog."  According to plaintiff, at no time after his discovery by Defendant Newton did he resist arrest, attempt to flee, or pose a threat to anyone's safety.  Also, according to plaintiff, Deputy Newton was in a position to intervene in both attacks, but instead stood by and watched.  On these facts, no particularized preexisting case law is necessary for it to be clearly established that defendant Coxwell's alleged actions violated plaintiff's constitutional right to be free from the excessive use of force.  Even if defendant Coxwell's conduct did not come within this narrow exception, the *Priester* case dictates the conclusion that no reasonable law enforcement officer could believe

this force was permissible given these alleged circumstances. For the same reasons, the undersigned does not believe particularized case law is necessary to overcome defendant Newton's claim of qualified immunity on plaintiff's failure-to-intervene claim. Should plaintiff prove his version of the facts, these deputy sheriffs who administered or failed to intervene in the K-9 attack are not entitled to qualified immunity.

## CONCLUSION

Based on the foregoing, the undersigned concludes that defendant Coxwell is not entitled to summary judgment on plaintiff's excessive force claim, nor is he entitled to summary judgment based on qualified immunity. The court reaches the same conclusions with respect to plaintiff's failure-to-intervene claim against defendant Newton.

Accordingly it is ORDERED:

That the clerk send a copy of this Report and Recommendation to plaintiff at his address of record <u>and</u> the following address: 9571 Nims Lane, Pensacola, Florida 32514.[5]

And it is respectfully RECOMMENDED:

1. That plaintiff's claims under the Fourteenth Amendment be DISMISSED.

2. That defendants' motion for summary judgment (doc. 25) be GRANTED IN PART AND DENIED IN PART as follows:

    a. Defendants' motion for summary judgment be granted as to plaintiff's official capacity claims against defendants and his claims for injunctive relief.

    b. Defendants' motion for summary judgment be denied as to plaintiff's individual capacity claims against defendants.

---

[5] Although plaintiff has not advised the court of a change of address, information on the Florida Department of Corrections' website indicates that plaintiff is no longer at his address of record -- Century Correctional Institution. He was released on November 1, 2005, with the Nims Lane address as his "stated residence upon release." *See* www.dc.state.fl.us.

   3.  That the clerk be directed to enter judgment accordingly and return this file to the undersigned for further proceedings.

At Pensacola, Florida this 21st day of December, 2005.


/s/ *Miles Davis*
**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636;** *United States v. Roberts*, **858 F.2d 698, 701 (11th Cir. 1988).**